[Cite as *In re J.H.*, 2024-Ohio-5102.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE J.H.                                :

                                          :                   No. 113855

A Minor Child                             :

                                          :

[Appeal by T.E., Mother]                  :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 24, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22909258

---

### *Appearances:*

Brian A. Smith Law Firm, LLC, and Brian A. Smith, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant ("Mother") appeals an order granting permanent custody of her child ("J.H.") to the Cuyahoga County Division of Children and Family Services ("the agency" or "CCDCFS"). She claims the following errors:

1. The trial court's ruling in case number AD22909258, granting appellee's motion to modify temporary custody to permanent custody, was not supported by clear and convincing evidence.

2. The trial court erred, by clear and convincing evidence, in holding, in case number AD22909258, that appellee used "reasonable efforts and diligent case planning by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home," with respect to appellant.

3. The trial court abused its discretion in denying appellant's request for a continuance of the March 11, 2024 trial.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} On September 13, 2022, CCDCFS filed a complaint seeking to designate J.H. a "dependent child" pursuant to R.C. 2151.04(B) and (D). The juvenile court granted emergency temporary custody of J.H. to the agency in October 2022, adjudicated J.H. a neglected and dependent child in December 2022, and committed J.H. to the agency's predispositional temporary custody in January 2023. In August 2023, the agency filed a motion to modify temporary custody to permanent custody, and the juvenile court held a trial on the motion in March 2024.

{¶ 4} At the start of the trial, Mother's trial counsel made an oral motion for a continuance because Mother was absent. Counsel had learned from the agency that Mother was not feeling well, but counsel admitted that she had been unable to contact Mother for the last three weeks. The agency opposed the motion on grounds that Mother had previously failed to appear for court hearings and because she was

not engaged in the services recommended by the agency. Based on the parties' arguments, the juvenile court denied the motion.

{¶ 5} Jessica Sanchez ("Sanchez"), an extended social service worker with CCDCFS assigned to J.H.'s case, testified that this case began in August 2022, when J.H. was staying with a family member and was afraid to return to Mother's care. According to Sanchez, the agency had substantiated concerns of physical abuse, and J.H.'s father ("Father") was incarcerated at that time. (Tr. 11-12.)[1]

{¶ 6} The agency had prior cases with J.H., who was nine years old at the time of trial, because Mother tested positive for marijuana when J.H. was born. The agency also had prior concerns about Mother's mental health and substance abuse, Father's lack of stable housing, and both parents being involved in domestic violence. (Tr. 10.) The agency previously obtained permanent custody of Mother's three older children due to the agency's concerns for Mother's mental-health and substance-abuse problems.

{¶ 7} Once J.H. came into agency custody in October 2022, the agency developed a case plan for both parents with the goal of reunification. The agency referred Mother to Signature Health to address her mental-health and substance-abuse issues. Sanchez testified that as of the trial date, Mother had not engaged in any services. When Sanchez asked Mother why she had not engaged in any services, Mother told her that "she doesn't have any substance abuse issues." However, the

---

[1] References to the transcript refer to the transcript of the trial held on March 11, 2024.

court had ordered Mother to submit to drug testing by hair follicle and urinalysis no later than October 24, 2023, and Mother failed to comply with the court's order. (Tr. 55-56.)

{¶ 8} In April 2023, after serving four years in prison for domestic violence, robbery, theft, and abduction, Father was referred to The Collaborative to help him find housing. Sanchez testified that Father provided a new residential address the Friday before the Monday trial. Prior to that, he claimed to have been living with his sister, but Sanchez was unable to visit his sister's residence despite leaving two notes at the address regarding attempts to make contact there. Sanchez also called and texted Father in an effort to visit the home but was unsuccessful. (Tr. 58-59.) Sanchez visited the new address provided by Father and learned that the residence belonged to Father's girlfriend. Sanchez also learned that Father had been living there with his girlfriend and her children for a few months and that Father was not listed on the lease. When Sanchez asked whether J.H. would have a room in the house if he were placed in Father's custody, Father told her that J.H. would have a room in the attic. However, Father claimed he was "doing some work still in the attic" and would not allow Sanchez to inspect that part of the home. (Tr. 16.)

{¶ 9} Sanchez investigated Father's girlfriend and found that the agency had recently investigated her for allegations of neglect and sexual abuse of her children, but the case was closed because the agency could not locate her. (Tr. 17.)

{¶ 10} Sanchez asked Father to provide proof of income. Father told Sanchez that he worked in contracting but he failed to provide any documentation to

substantiate his employment. (Tr. 18, 39-40.) Father also refused to provide Sanchez with identifying information for the parole officer who was supervising his three years of postrelease control. (Tr. 19, 90.) And, Father refused to submit to any drug screening despite having a history of drug convictions.

{¶ 11} Both parents were entitled to visitation while J.H. was in temporary agency custody. However, according to Sanchez, their visits were "sporadic." At the time of the March 11, 2024 trial, neither parent had visited J.H. since the Christmas holidays, but Father had once dropped off some snacks with the child's caregiver in February. J.H. was living with an adult half-brother at the time of trial, and J.H. indicated to Sanchez that he was happy living there. Elba Heddesheimer, the guardian ad litem ("GAL"), testified that J.H. was happy living with his brother but he also indicated that he loves Mother and Father.

{¶ 12} Sanchez testified that neither parent had resolved the issues that caused J.H. to be taken into custody and that neither parent was capable of providing a safe and stable permanent home for him. (Tr. 24-25.) Both Sanchez and the GAL recommended that the juvenile court grant the agency permanent custody of J.H. even though his adult brother was unwilling to adopt him and the agency was investigating a maternal great aunt as another possible placement.

{¶ 13} Father testified at trial and indicated that he wanted J.H. to be placed in his care. On cross-examination, Father indicated that he had been residing with his sister, but was only there "off and on" because he was "living with [his] wife," whom he also referred to as his "girlfriend." (Tr. 95.) Father explained that he only

gave Sanchez his girlfriend's address three days earlier because "I didn't know if that was gonna be my permanent residence or not, so I didn't want to give her an address that I wasn't sure of." (Tr. 98.) Despite having previously stated that he was living with his wife, he acknowledged that the residence belongs to his girlfriend, that his name is not on the lease, and that he could be made to move out at any time. (Tr. 102.) He also admitted that he had no proof of payment of utilities or any documentation of his alleged earnings as required by the agency. (Tr. 102-104.)

{¶ 14} Father stated that he has known Mother for 25 years and claimed that her mental issues were overstated. He described her as "a normal girl" but that she "drinks a lot and I keep an eye on her." (Tr. 108.) On further questioning, he admitted that Mother lost custody of all of her children over the years. (Tr. 108-109, and 114.)

{¶ 15} After hearing the evidence and the parties' closing arguments, the juvenile court took the matter under advisement. The court later issued a judgment entry terminating all parental rights and ordering that J.H. be placed in the permanent custody of CCDCFS. Mother now appeals the juvenile court's judgment.[2]

## II. Law and Argument

### A. Permanent Custody

{¶ 16} In the first assignment of error, Mother argues the juvenile court's judgment modifying temporary custody to permanent custody was not supported

---

[2] Father is not a party to this appeal. Therefore, our decision is limited to issues raised by Mother.

by clear and convincing evidence. In the second assignment of error, she contends the juvenile court's finding that the agency used reasonable efforts and diligent case planning to assist the parents to remedy the problems that initially caused the child to be placed outside the home is not supported by clear and convincing evidence. We discuss these assigned errors together because they are interrelated.

{¶ 17} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "fundamental liberty interest . . . in the care, custody, and management of [his or her child]." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The termination of parental rights is regarded as "'the family law equivalent of the death penalty in a criminal case.'" *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 97 Ohio St.3d 92, ¶ 14. Thus, parents "'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 18} Nevertheless, a parent's right to the care and custody of his or her child is not absolute. *In re L.G.*, 2022-Ohio-529, ¶ 49 (8th Dist.). "'[T]he natural rights of a parent . . . are always subject to the ultimate welfare of the child, which is the polestar or controlling principal to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 19} All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.*, 2013-Ohio-1704, at ¶ 66 (8th Dist.), quoting *In re*

*Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), citing *In re Howard*, 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

{¶ 20} Ohio statutes governing child custody and protection "'appropriately reflect the need to balance . . . [the] parents' . . . interest in the custody, care, nurturing, and rearing of their own children, and the state's parens patriae interest in providing for the security and welfare of children under its jurisdiction[.]'" *In re P.S.*, 2023-Ohio-144, ¶ 26 (8th Dist.), quoting *In re Thompson*, 2001 Ohio App. LEXIS 1890 (10th Dist. Apr. 26, 2001).

{¶ 21} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month

period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e). "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.*, 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 22} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then consider the factors listed in R.C. 2151.414(D) to determine, by clear and convincing evidence, whether it is in the child's best interest to grant permanent custody to the agency pursuant to R.C. 2151.414(D). *In re H.G.*, 2024-Ohio-3408, ¶ 16 (8th Dist.).

{¶ 23} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 2014-Ohio-2051, ¶ 28 (8th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 24} Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, the Ohio Supreme Court has held that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the

nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* [*v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, 972 N.E.2d 517]. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jur.3d, Appellate Review, § 603 (1978);

*Id.* at ¶ 14.

{¶ 25} Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re P.S.*, 2023-Ohio-144, at ¶ 30, citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.).

### 1. First Prong – R.C. 2151.414(B)

{¶ 26} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(d), that "[t]he child has been

in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period."

{¶ 27} When assessing the length of time during which a child has been in agency custody, R.C. 2151.414(B)(1)(e) provides that "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." In addition, when calculating whether a child has been in an agency's temporary custody for the requisite time, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count." *In re C.W.*, 2004-Ohio-6411, ¶ 26. In other words, "the time-period for R.C. 2151.414(B)(1)(d) is calculated from when the child enters custody of the agency and the filing of the motion for permanent custody." *In re J.C.*, 2018-Ohio-2234, ¶ 29 (8th Dist.), citing *In re C.W.* at ¶ 26.

{¶ 28} J.H. was committed to emergency, temporary custody pursuant to a journal entry dated October 18, 2022. The agency filed the motion to modify temporary custody to permanent custody on August 18, 2023, only ten months after J.H. was taken into agency custody. Therefore, the juvenile court's finding that J.H. had been in agency custody for twelve or more months of a consecutive twenty-two month period, though accurate in terms of actual physical custody, was not proper for purposes of R.C. 2151.414(B)(1)(d).

{¶ 29} Nevertheless, the court also found that J.H. could not be placed with one of his parents within a reasonable time or should not be placed with either

parent. R.C. 2151.414(B)(1)(a) provides that the court may grant permanent custody of a child to a movant if the court determines, by clear and convincing evidence, at the hearing held pursuant to division (A) of this section that it is in the best interest of the child to grant permanent custody of the child to the agency and

> [t]he child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(B)(1)(a).

{¶ 30} "When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E)." *In re L.H.*, 2024-Ohio-2271, ¶ 34 (8th Dist.). "A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent." *In re Ky.D.*, 2024-Ohio-3198, ¶ 36 (8th Dist.), citing *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.).

{¶ 31} The juvenile court found that J.H. could not be placed with either parent within a reasonable time pursuant to R.C. 2151.414(E)(1), (2), (4), and (11). Those provisions state:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 32} The juvenile court found, pursuant to R.C. 2151.414(E)(1), that Mother failed to remedy the conditions that initially caused the removal of J.H.

"notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems[.]" As previously stated, Mother argues in the second assignment of error that the juvenile court's finding that the agency used reasonable case planning and diligent efforts to assist the parents is not supported by clear and convincing evidence.

{¶ 33} Sanchez testified that J.H. was removed from Mother's care because the agency was concerned about Mother's mental-health and substance-abuse problems. There were also concerns about domestic violence and a lack of stable housing. Mother's older children were previously placed in the permanent custody of CCDCFS due to the same concerns of mental-health and substance-abuse issues. Yet, Mother refused to comply with agency requests for drug testing and treatment and, at the time of trial, she had made no effort to engage in any mental-health services. (Tr. 12-13, 49, 51-55, and 57.) When Sanchez asked Mother why she had not engaged in services, Mother told her "she doesn't have any substance abuse issues." However, Mother tested positive for marijuana at the time of J.H.'s birth. Moreover, if she really had no substance-abuse issues, she could have proven that fact by completing drug testing. Having failed to demonstrate the absence of any substance-abuse problems, the agency had to assume that the problems were ongoing in order to protect the child.

{¶ 34} Moreover, the evidence shows that the agency referred Mother for services to help her remedy the problems that caused the removal of J.H., but she refused to engage in any of the services. She also failed to make any effort to

demonstrate the lack of any problems. The weight of the evidence, therefore, shows that Mother's failure to remedy the problems that caused the removal of her child were her own fault and not the fault of any failure on the part of the agency.

{¶ 35} Father's case plan required him to demonstrate financial stability and housing. (Tr. 18.) According to Sanchez, Father claimed to be living with his sister when he was residing with his girlfriend. Because Father was not listed on the lease, the agency was concerned that he could be "kicked out at any time." (Tr. 38.) Father also failed to provide proof of employment or income, despite requests for such information. (Tr. 18, 34.) According to Sanchez, Father also refused agency requests for drug testing, claiming he did not have any substance-abuse issues. (Tr. 19.) Therefore, the trial court's finding that J.H.'s parents failed to remedy the conditions that initially caused his removal is supported by the manifest weight of the evidence.

{¶ 36} The juvenile court also found, pursuant to R.C. 2151.414(E)(2), that Mother's chronic mental illness and chemical dependency rendered her unable to provide an adequate permanent home for J.H. Sanchez testified that despite agency concerns for Mother's mental-illness and substance-abuse issues, Mother made no effort to comply with the agency's referrals for mental-health and substance-abuse treatment. Although she claimed she had no substance-abuse problems, she refused to submit to any drug testing. Therefore, the court's finding that Mother is unable to provide an adequate permanent home for J.H. due to her chronic mental-illness and substance-abuse issues is supported by the evidence.

{¶ 37} The juvenile court found, pursuant to R.C. 2151.414(E)(4), that both Mother and Father demonstrated a lack of commitment toward J.H. by failing to regularly support, visit, or communicate with him. As previously stated, Sanchez's uncontested testimony showed that Mother failed to engage in case-plan services designed to promote reunification with J.H. And, according to Sanchez, Mother and Father only visited with J.H. "sporadically." Indeed, at the time of trial in March 2024, neither parent had visited with J.H. since the Christmas holidays, more than two months earlier. Moreover, Mother failed to appear for trial at which the permanent custody of her child was to be decided. Therefore, the trial court's finding as to the parents' lack of commitment toward the child is supported by clear and convincing evidence.

{¶ 38} Finally, the court found, pursuant to R.C. 2151.414(E)(11), that Mother "has had parental rights involuntarily terminated with respect to a sibling of the child[.]" Sanchez testified that Mother's older children were permanently removed from her custody due to her unaddressed mental-health and substance-abuse issues. And, the agency submitted evidence of journal entries from those cases where Mother's parental rights were terminated, thus corroborating Sanchez's testimony. Therefore, the court's finding under R.C. 2151.414(E)(11) is supported by clear and convincing evidence.

{¶ 39} The juvenile court's findings under R.C. 2151.414(E) mandated the determination that J.H. could not, or should not, be returned to either parent within a reasonable time. *In re B.B.C.*, 2024-Ohio-588, ¶ 20 (8th Dist.) ("Pursuant to R.C.

2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(16) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."). Therefore, the first prong of the permanent-custody analysis is supported by the manifest weight of the evidence.

## 2. Second Prong — Best Interests of the Child

{¶ 40} Having determined that competent and credible evidence supports the juvenile court's finding that the child could not or should not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis that requires the court to determine, by clear and convincing evidence, whether the order granting permanent custody of J.H. to the agency pursuant to R.C. 2151.414(D) is in the child's best interest.

{¶ 41} In determining the best interest of the child, a juvenile court may apply one of two different tests set forth in R.C. 2151.414(D)(1) and (D)(2). *In re A.F.*, 2023-Ohio-4423, ¶ 41 (8th Dist.), citing *In re S.C.*, 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.*, 2019-Ohio-1619, ¶ 39 (10th Dist.).

{¶ 42} In determining the best interest of the child under R.C. 2151.414(D)(1), the juvenile court must consider all relevant factors, including but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial

history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 43} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent-custody determination, "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.*, 2020-Ohio-5102, ¶ 31. "Consideration is all the statute requires." *Id.*

{¶ 44} In analyzing the best-interest factors listed in R.C. 2151.414(D)(1)(a), "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Moreover, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 2015-Ohio-2410, ¶ 30 (8th Dist.).

{¶ 45} Alternatively, the court may apply the second test set forth in R.C. 2151.414(D)(2), which provides:

> If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:
>
> (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

If all the factors enumerated under R.C. 2151.414(D)(2) are applicable, permanent custody is per se in the child's best interest and the juvenile court must commit the child to the permanent custody of the agency. *In re G.A.*, 2020-Ohio-2949, ¶ 61 (8th Dist.), citing *In re J.R.*, 2018-Ohio-1474, ¶ 41 (10th Dist.).

{¶ 46} The juvenile court in this case indicated that it considered the factors outlined in R.C. 2151.414(D)(1) when it made the best-interest-of-the-child determination. Considering J.H.'s relationship with his parents, the court found that J.H. loves his parents and that he wants to maintain contact with them. However, J.H. also indicated he was happy living with his older brother and that he did not want to return to Mother's custody. (Tr. 61.) The GAL stated in her report that J.H.'s older brother had been taking care of him "on and off during the last four years" and that he "wishes to protect his little brother." (GAL report p. 2-3.) The evidence further showed that J.H.'s parents only visited him sporadically. (Tr. 21-23.) Thus, because the parents failed to demonstrate a strong relationship with J.H., this factor weighs in favor of permanent custody.

{¶ 47} The consideration listed in R.C. 2151.414(D)(1)(b) involves the child's wishes as expressed directly through the child's GAL. The GAL in this case testified that when she asked J.H. what he wanted her to recommend, he went "back and forth and said that he's very happy where he is, but he loves his mom and dad, so he couldn't take a position on that." (Tr. 121-123.) However, in her report, the GAL indicated that J.H. "does not wish to go back with [Mother]" and that "he does not feel safe with his mother." (GAL report p. 2.) Based on the circumstances presented in the case and J.H.'s statements, the GAL recommended that the agency be granted permanent custody of J.H. Therefore, the juvenile court was within its discretion to conclude that this factor favored permanent custody.

{¶ 48} The factor listed in R.C. 2151.414(D)(1)(c) concerns the child's custodial history, including whether the child has been in temporary custody for 12 or more months of a consecutive 22-month period. In this case, J.H. was placed in temporary custody in October 2022 and remained in continuous agency custody until the time of trial in March 2024. J.H. remained in agency custody for a continuous 17-month period. Moreover, there was evidence that J.H. lived with his adult brother for extended periods of time over the course of the last four years, and there were no signs that either parent would be able to take custody of J.H. in the foreseeable future. Therefore, this factor also weighs in favor of permanent custody.

{¶ 49} The consideration listed in R.C. 2151.414(D)(1)(d) deals with the child's need for a legally secure placement and whether a secure placement can be achieved without a grant of permanent custody. As previously stated, the trial court

found that J.H. should not be placed with either parent within a reasonable time. It, therefore, follows that J.H.'s need for a secure placement can only be achieved through a grant of permanent custody.

{¶ 50} Finally, R.C. 2151.414(D)(1)(e) deals with "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(E)(11) provides consideration of whether the parent has previously had her parental rights involuntarily terminated with respect to a sibling of the child. As previously stated, Sanchez testified that Mother's parental rights with respect to three older children were involuntarily terminated, and certified copies of judgment entries were admitted into evidence to corroborate her testimony. Therefore, this finding was also supported by the manifest weight of the evidence.

{¶ 51} The juvenile court complied with the statutory requirements set forth in R.C. 2151.414(D)(1), and its determination that permanent custody was in J.H.'s best interests is supported by competent, credible evidence. Mother nevertheless argues that because J.H.'s adult brother has not demonstrated a willingness to adopt J.H., and the parents could have been provided more time to work on the goal of reunification, permanent custody was not in J.H.'s best interest. However, the juvenile court is not required to factor adoption possibilities into its analysis, and the agency is bound to seek adoption for the child if permanent custody is granted. *In re. T.R.*, 2008-Ohio-5219, ¶ 16. And, although the parents could have been given more time to work on their case plans, the evidence showed it would not have made any difference since neither parent had made any effort to do so throughout the

pendency of this case, and Mother did not even appear for trial. Therefore, the decision to grant permanent custody was appropriate and the juvenile court's findings are supported by the manifest weight of the evidence.

{¶ 52} The first and second assignments of error are overruled.

## B. Continuance

{¶ 53} In the third assignment of error, Mother argues the trial court abused its discretion in denying Mother's request for a continuance of the March 11, 2024 trial. She contends the trial court's denial of her requested continuance deprived her of an opportunity to testify about material issues in the case and that it, therefore, unfairly prejudiced her.

{¶ 54} The decision to grant or deny a motion for a continuance rests in the sound discretion of the trial court. *State v. Unger*, 67 Ohio St.2d 65 (1981). A court abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. An abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.). An abuse of discretion also implies a decision that is unreasonable, arbitrary, or unconscionable. *State ex rel. DiFranco v. S. Euclid*, 2015-Ohio-4915, ¶ 13. When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

{¶ 55} The right to parent one's children is a fundamental right protected by the Due Process Clause of the United States and Ohio Constitutions. *In re M.W.,* 2016-Ohio-2948, ¶ 9. A fundamental requirement of due process includes an opportunity to be heard. *Id.* However, as previously stated, a parent's right to be present at a permanent custody hearing is not absolute. *Id.* at ¶ 10, citing *In re C.G.,* 2012-Ohio-5999, ¶ 19 (9th Dist.).

{¶ 56} Although courts must ensure that due process is provided in parental-termination proceedings, "a parent facing termination of parental rights must exhibit cooperation and must communicate with counsel and with the court in order to have standing to argue that due process was not followed in a termination proceeding." *In re Q.G.,* 2007-Ohio-1312, ¶ 12 (8th Dist.). Any potential prejudice to a party denied a continuance is weighed against a trial court's "right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *Unger* at 67. Furthermore, R.C. 2151.414(A)(2) requires that a juvenile court hold a hearing on a public children services agency's motion for permanent custody no later than 120 days after the agency files a motion for permanent custody, though a reasonable continuance may be granted "for good cause shown."

{¶ 57} In *Unger*, the Ohio Supreme Court noted that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request

is denied." *Unger* at 67. In *Unger*, the Court identified certain factors a court should consider in evaluating a motion for a continuance. These factors include

> the length of the delay requested; whether other continuances have been requested and received, the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id*. at 67-68.

{¶ 58} On the morning of trial, Mother's trial counsel made an oral motion to continue the trial because Mother was absent. Counsel advised the court that Mother "[wa]s not feeling well." Counsel had heard that Mother was not feeling well from CCDCFS's lawyer, but she was unable to provide any more information to justify a continuance. Mother's counsel also acknowledged that she had not spoken with Mother "for about three weeks" despite counsel's repeated attempts to contact her. Counsel for CCDCFS opposed the day-of-trial continuance on grounds that Mother had "failed to appear at prior hearings" and "[wa]s not currently engaged in services[.]"

{¶ 59} The record further shows that multiple individuals appeared for trial, including lawyers for all the parties, the child's father, the agency caseworker, and the GAL. Selecting a new trial date would have inconvenienced all of these people as well as the court itself. Moreover, the record shows the requested delay was not for legitimate reasons since Mother did not even contact her lawyer to provide a legitimate reason for the continuance, and her claim that she was not feeling well

was not credible given her failure to make any effort to comply with the plan designed to reunify her with her child. Therefore, the facts do not support Mother's claim under the considerations set forth in *Unger*.

{¶ 60} Accordingly, the third assignment of error is overruled.

{¶ 61} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
MICHAEL JOHN RYAN, J., CONCUR